UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                                                Case No. 3:18cr66/MCR

JERRY T. VERTEFEUILLE
_____/

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Jerry T. Vertefeuille, submits the following Sentencing Memorandum. The Court has scheduled Mr. Vertefeuille's sentencing to take place on January 18, 2019 (ECF No. 25).

### PRELIMINARY STATEMENT

Mr. Vertefeuille fully concedes his guilt to a variety of criminal offenses. He entered a guilty plea to an information, and did not require the government to obtain a grand jury indictment. He has voluntarily submitted to questioning by the investigators in this matter. In acknowledgement of his obligation to pay restitution, he has already deposited in excess of $70,000 into the clerk's registry.

With the notable exception of the criminal offenses at issue, Mr. Vertefeuille has lived a life in service of his country. He has no criminal history. He is well-regarded as an industrious and helpful member of his community.

I. **APPLICABLE LAW**

In *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the United States Supreme Court invalidated the mandatory nature of the United States Sentencing Guidelines and rendered the Guidelines merely advisory. This has significantly broadened the discretionary sentencing range for federal courts.  *Gall v. United States*, 552 U.S. 38, 59 (2007) (finding a sentence outside the Guidelines reasonable); *Kimbrough v. United States*, 552 U.S. 85, 100 (2007) (noting that courts may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines); *Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations").  Although the Guidelines are to be given "fair consideration" before imposing a sentence, "in the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and

the punishment to ensue.") (internal quotations and citations omitted). Regarding this individualized assessment, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Indeed, the Court "may vary [from the Guidelines range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotations and citations omitted); *Gall v. United States*, 552 U.S. 38, 47 (2007) (court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range").

Post-*Booker*, sentencing requires two steps. First, the district court must consult the Guidelines and correctly calculate the sentencing range provided by the Guidelines. *United States v. Talley*, 432 F.3d 784, 786 (11th Cir. 2005). Second, the court must consider the factors set forth in 18 USC §3553(a) to determine a reasonable sentence, which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public, and to provide the defendant with needed treatment or training;

(3) the kinds of sentences available;

(4) the Guidelines range;

3

>   (5)   any pertinent policy statements of the Sentencing Commission;
>
>   (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>   (7)   the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a); *Kimbrough*, 552 U.S. at 59; *Talley*, 432 F.3d at 786. When supportable by the 18 U.S.C. §3553(a) sentencing factors, a below-guidelines sentence is not unreasonable. *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007).

Although district courts must "give respectful consideration to the Guidelines," they may "tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101 (quoting *Booker*, 543 U.S. at 245-46). Therefore, "the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Id.* at 113 (Scalia, J., concurring).

## II.   APPLICATION OF 18 U.S.C. §3553(a) FACTORS

Application of the 3553(a) factors to this case compels the conclusion that a downward variance from the guideline sentence is not only permissible, but is required in the interest of justice:

**(1)      The nature and circumstances of the offense and the history and characteristics of the defendant.**

**A.      <u>Nature and Circumstances of the Offense</u>**

The essence of the offenses to which Mr. Vertefeuille has pleaded guilty relate to unlawful activities in his role as a Contracting Officer Representative (COR) for the 96th Maintenance Group (96 MXG) at Eglin Air Force Base. Specifically, Mr. Vertefeuille conspired with the co-defendant, Christopher Carter, to defraud the Air Force via the submission of fraudulent invoices for certain maintenance work on the 96 MXG paint booth.  Although Mr. Vertefeuille certainly concedes that he defrauded the Air Force for certain maintenance work and supplies, he disputes that he participated in or had knowledge of any fraud related to a certain component of the paint booth maintenance work, *i.e.*, the "CLIN10" losses.

In regards to the CLIN10 losses, it is important to note that Mr. Vertefeuille was involved in two separate, but related, contracts at Eglin relevant to the matters before the Court:

- **AGE Contract**:  The first contract was the Aerospace Ground Equipment contract.  The AGE contract was for corrosion control on military equipment.  The AGE contractor—Trinity Analysis and Development Corp. (TADC)—performed much of the corrosion control in the paint booth at the 96 MXG.  For the most part, the AGE

contractor was <u>not</u> hired to perform intensive or involved maintenance on the paint booth equipment. Notably, TADC was not responsible for intensive maintenance and repairs to the paint booth equipment.

- **TCC Contract**: The second contract was a paint booth maintenance contract between the USAF and TCC Services Unlimited, LLC (TCC). This contract obligated TCC to perform to provide various goods and services to maintain the paint booth and the equipment used to operate the paint booth.

It is also important to note that the Defense Federal Acquisition Regulation Supplement ("DFARS") rules governing the AGE contract required certain documentation as to approval, pricing and inspection of work performed by a military contractor. That said, a significant component of the work related to the paint booth maintenance performed by TCC was pursuant to an "over and above work" contractual arrangement under DFARS 217.77. The "over and above work" for the paint booth maintenance was performed under a separate contract line item—Contract Line Item 10 ("CLIN10"). In this regard, the Department of Defense promulgated Procedures, Guidance and Information rules ("PGI) related to administration of DoD contracts. In regards to "over and above work," PGI 217.7701 states:

    PGI 217.7701  Procedures.

    (1)  Contracts for the performance of maintenance, overhaul, modification, and repair of various items (e.g., aircraft, engines, ground support equipment, ships) generally contain over and above work requirements.  When they do, the contracting officer shall establish a separate contract line item for the over and above work.

    (2)  Over and above requirements task the contractor to identify needed repairs and recommend corrective action during contract performance.  The contractor submits a work request to identify the over and above work and, as appropriate, the Government authorizes the contractor to proceed.

    (3)  The clause at DFARS 252.217-7028, Over and Above Work, requires the contractor and the contracting officer responsible for administering the contract to negotiate specific procedures for Government administration and contractor performance of over and above work requests.

    (4)  The contracting officer may issue a blanket work request authorization describing the manner in which individual over and above work requests will be administered and setting forth a dollar limitation for all over and above work under the contract.  The blanket work request authorization may be in the form of a letter or contract modification (Standard Form 30).

    (5)  Over and above work requests are within the scope of the contract. Therefore, procedures in DFARS subpart 217.74, Undefinitized Contract Actions, do not apply.

    (6)  To the maximum extent practical, over and above work shall be negotiated prior to performance of the work.

Although the AGE contract had fairly intensive documentation requirements, the "over and above work" performed by TCC under CLIN10 did not.  Notably, neither the DFARS rules nor the PGI required that TCC furnish the Air Force with

invoices for purchases made by TCC to perform the "over and above work" under CLIN10.

The relaxed documentation requirements for CLIN10 is relevant because Mr. Vertefeuille disputes that he had involvement in or knowledge of any fraud related to CLIN 10. Although he fully admits that he participated in fraudulent activities related to CLINs 1 through 9, he was entirely unaware of any fraud related to CLIN10. Although the Government claims that there are undocumented contractor expenses related to CLIN10, Mr. Vertefeuille was not involved in those losses. Moreover, it is not entirely unexpected that the contractor's CLIN10 losses might have minimal documentation of the contractor's expenses for materials, labor, and the like. The very nature of the CLIN10 work—*i.e.*, an "over and above" contract—indicates that documentation of the contractor's costs might be scant.

### B. History and Characteristics of Defendant

#### i. Mr. Vertefeuille's Military and Civil Service Career

Mr. Vertefeuille volunteered for military service with the USAF in 1983. He received an Honorable Discharge from the USAF in 1987. Following his discharge from active duty, he served in the USAF Reserves from 1987 to 1995. During his service with the USAF, Mr. Vertefeuille received the Air Force

Outstanding Unit Award With Valor Device, the Air Force Good Conduct Medal, and the Air Force Training Ribbon.

Between 1988 and 2016, Mr. Vertefeuille worked for the DoD at Eglin Air Force Base. He served in the role of COR for 96 MXG.

### ii. Prior Cost-Savings Efforts by Defendant

Mr. Vertefeuille admits that he committed a number of grave errors in judgment in engaging in the criminal activity at issue. Despite his wrongdoing, however, Mr. Vertefeuille engaged in other activities for the USAF during his government career that saved the USAF hundreds of thousands—if not millions—of dollars. **Exhibit "A" hereto** is a letter from Mr. Vertefeuille in which he describes some of the cost savings he achieved for the USAF during his tenure as a COR at Eglin. He explains:

- Mr. Vertefeuille coordinated the use of existing USAF facilities at Eglin AFB to provide "in-house" corrosion control services for other DoD organizations instead of having an off-site contractor perform the services. These DoD organizations included Tyndall AFB, Pensacola NAS, USCG, the US Army 7th Special Forces, and others.

- The in-house corrosion control services were less inexpensive than off-site contractors, and required less down time for the military equipment.

- The use of Eglin's in-house corrosion control services saved the American taxpayers millions of dollars.

### iii. <u>Defendant has no criminal history</u>

Prior to this plea, Mr. Vertefeuille had no criminal history. He is a first-time offender. Consistent with these facts, the Probation Officer found that Mr. Vertefeuille's "criminal conduct in this case represents a marked deviation from an otherwise law-abiding life." ECF No. 27 at ¶ 150.

### iv. <u>Defendant's Letters in Support</u>

A number of friends, colleagues and family members have submitted letters in support of Mr. Vertefeuille. *See* ECF No. 27-2. These letters demonstrate that Mr. Vertefeuille is a valued member of his community. Those individuals who submitted letters in support of Mr. Vertefeuille include:

- **Terrance Anson**, a long-time friend and former co-worker. He describes Mr. Vertefeuille's achievements of the recovering "the highest reimbursable assets to the 96th Maintenance Group several years running." Mr. Anson further states that Mr. Vertefeuille's offenses are "certainly out of character for the man I saw every day at work."

- **David Bouchette**, a business partner in Mr. Vertefeuille's cabinet business. Mr. Bouchette describes Mr. Vertefeuille has hard-working, kind, and compassionate. He states, "I trust him with every part of our business."

- **Dr. Michael Harris**, a customer of Mr. Vertefeuille's cabinet business. Dr. Harris describes Mr. Vertefeuille as remorseful and embarrassed for his actions. He states that, despite his criminal offenses, Mr. Vertefeuille is "a respectable, honest, hard working individual who deserves some consideration."

- **Justin Paperny**, the Executive Director of the Straight A Guide Foundation. The SAGF is an organization that focuses on assisting former prisoners and preparing them for life after prison. Mr. Paperny describes Mr. Vertefeuille's volunteer efforts for SAGF and expresses his gratitude for Mr. Vertefeuille's help.

- **Myrna Parjani**, an elderly neighbor, describes the assistance Mr. Vertefeuille has regularly provided to her and her husband. Mr. Parjani describes incidents in which she and her husband had medical issues and Mr. Vertefeuille assisted her family: "He comes right away whenever we need him." She states that Mr. Vertefeuille "provides us security and peace of mind." She adds, "If Jerry is home, then we know we are safe."

- **Sharon Smith,** Mr. Vertefeuille's sister-in-law, relates Mr. Vertefeuille's efforts to rescue her from a dangerous domestic situation and describes him as her "hero." Ms. Smith is disabled, and states that Mr. Vertefeuille "has gone above and beyond normal brother-in-law activities." These include

transporting her to psychiatric and medical appointments and taking her to the grocery store. Ms. Smith also describes Mr. Vertefeuille's efforts to support his niece by transporting her to athletic lessons, attending parent-teacher conferences in Ms. Smith's stead, and purchasing clothes. She confirms that Mr. Vertefeuille provides enormous assistance to Mr. Vertefeuille's mother, as well as others in her neighborhood. She states, "Jerry will help anybody in any way he can."

- **Gail Vertefeuille Whayne,** Mr. Vertefeuille's half-sister, describes the assistance Mr. Vertefeuille provided to her and her husband through the years. She also describes the support he provides to other members of his family and his friends:

  > I am very proud of my brother as I witnessed his care of his sister-in-law, Sharron. Sharron and her daughter Faith were in a bad living situation and Jerry, without question, moved them to Niceville. I have seen him drop what he is doing to go pick up Faith from school or to take her to friends. He does the same when Sharron needs a ride to the doctor. It takes an incredible man to take on an extended family in the way Jerry has done.
  >
  > I have seen Jerry also help friends that came on hard times by hiring them himself or finding work for them.

  She adds that Mr. Vertefeuille has recognized the need for mental health treatment: "His determination to move forward is an example to those around him."

- **Carol Vertefeuille,** Mr. Vertefeuille's 81-year-old mother, describes the wide variety of tasks Mr. Vertefeuille regularly performs for her.  He drives his mother to all of her doctors' appointments, picks up her prescriptions, buys her groceries, and maintains her house and yard.  She states that Mr. Vertefeuille will "stand tall and accept the consequences" of his actions.

- **Wendy Vertefeuille**, Mr. Vertefeuille's wife of 24 years, states that he has always been willing to help family and neighbors whenever he could.  These include assisting Mrs. Vertefeuille's disabled sister, Mr. Vertefeuille's mother, and elderly neighbors.  She describes her husband's unwavering support during her completion of her bachelor's and master's degrees.  She states that Mr. Vertefeuille is "deeply remorseful and ashamed of his unethical and illegal activities."  She adds that he "has accepted responsibility for his crimes and I know in my heart he will never be on the wrong side of the law again."

  v. **Risk of Recidivism**

Mr. Vertefeuille's offenses are an aberration.  There is no risk of recidivism, especially in light of his deep connections with his family members who reside in the local community.  *See United States v. Neufeld*, 2007 WL 1231755 (11th Cir. 2007) (below-guidelines sentence not unreasonable where trial court found

possibility of recidivism was substantially reduced by defendant's extraordinary support available from his family, rabbi and community).

**(2)** **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public, and to provide the defendant with needed treatment or training.**

A lengthy sentence of incarceration is not required to reflect the seriousness of the offense. Mr. Vertefeuille fully recognizes the seriousness of his act. His conviction for this offense will be a lifelong stain on an otherwise admirable record of service to his country. Because of the matters described in the information and the prosecution of this action, Mr. Vertefeuille no longer engages in activity or business in support of the USAF or U.S. Government. In fact, he has been formally debarred from any future contracting activities. This prosecution and conviction certainly provide a harsh deterrent to any others who might violate false statement laws. No rational person would take any message from this case other than that similar conduct risks devastating and fundamentally life-changing results.

Furthermore, the observations expressed in the letters from Mr. Vertefeuille's friends, family and other members of the community provide every reason to believe that Mr. Vertefeuille will not re-offend, a conclusion only buttressed by his age. S*ee United States v. Ruiz*, 04 Cr. 1146 (RWS), 2006 WL

1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants.")

Likewise, Mr. Vertefeuille's substantial familial obligations—notably, his ongoing care for his elderly and infirm mother—are an acknowledged deterrent to future criminal conduct. *See United States v. Olis*, 03 Cr. 217 (SL), 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting significant downward variance where the "need to provide support for his family will provide adequate deterrence against any potential future criminal conduct"). **Exhibit B** hereto details his mother's condition, her prognosis, and Mr. Vertefeuille's role in caring for her.

### (3)     The kinds of sentences available.

Under *Booker* and its progeny, this Court has considerable discretion in the type of sentence to be imposed. Mr. Vertefeuille suggests that a lengthy prison sentence is neither required nor warranted under the circumstances. Furthermore, Mr. Vertefeuille suggests that supervised release or probation is not an unreasonable sentence. Mr. Vertefeuille has been debarred from contracting with the federal government due to the charges in this case, which already has served as significant and lasting punishment.

**(4)** **<u>The Guidelines range.</u>**

With one notable exception, Mr. Vertefeuille does not dispute the guidelines calculation in the PSIR. Specifically, Mr. Vertefeuille's objection to the PSIR's guidelines calculations is the assessment of 10 additional offense levels under USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1) because of an alleged loss to the USAF of $188,399.46. Of this amount, $46,076.87 represents losses from CLIN10. *See* PSIR, ¶ 207 (ECF No. 27). As explained above, Mr. Vertefeuille disputes that he engaged in (or knew of) any fraud related to CLIN10. Accordingly, the total loss is more accurately calculated as no more than $142,331.31 (*i.e.*, $188,399.46 [Government's calculation of loss] minus $46,068.17 [CLIN10 losses]). A loss of less than $150,000 results in 8 additional offense levels being added to the guidelines calculation.

When one reduces the loss level from $188,399.46 to $142,331.31, and makes a corresponding reduction in the additional offense levels from 10 to 8, the Total Offense Level is 27 instead of 29. This results in a guidelines range of 70 to 87 months in Criminal History Category I (*i.e.*, no criminal history).

**(5)** **<u>Any pertinent policy statements of the Sentencing Commission.</u>**

With the exception of the guidelines' goal of uniform sentencing, no particular policy statements appear immediately relevant to Mr. Vertefeuille's sentencing.

**(6) <u>The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.</u>**

Counsel has not located any reported cases in this regard.

**(7) <u>The need to provide restitution to any victims of the offense.</u>**

The Presentence Investigation Report indicates that Mr. Vertefeuille is obligated to pay $188.399.46 in restitution to the USAF. Mr. Vertefeuille agrees that he is obligated to pay restitution, but disputes a portion of this amount. As explained above, Mr. Vertefeuille disputes that he should be held responsible for the CLIN10 losses (*i.e.*, $46,076.87). If the CLIN10 losses are excluded from the restitution calculation, the total restitution owed by Mr. Vertefeuille is $142,331.31.

Mr. Vertefeuille has already paid approximately half of this amount ($70,212) into the clerk's registry as his portion of the restitution. Mr. Vertefeuille understands that his co-defendant, Mr. Carter, is willing and able to likewise contribute a sizeable portion in payment of restitution. Should Mr. Carter do so, the vast majority of the restitution will be paid in full.

**III. <u>CONCLUSION</u>**

Mr. Vertefeuille fully recognizes his wrongful acts. The undersigned suggests that Mr. Vertefeuille's sentence reflect the nature of his crime while

taking into account the fact that this conduct was a marked deviation from his character. Moreover, notwithstanding the wrongdoing in this matter, Mr. Vertefeuille provided significant cost savings to the American taxpayers through his efforts to have DoD equipment maintained in-house. Counsel for Mr. Vertefeuille respectfully submits that this unfortunate blemish on Mr. Vertefeuille's otherwise clean criminal record warrants no more than a sentence of supervised release or probation, and respectfully urges the Court to exercise its discretion to tailor such a sentence for Mr. Vertefeuille.

\* \* \*

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

This document complies with Local Rule 7.1(F) because it contains 3,631 words, excluding those portions of the motion exempted under the Local Rule.

\* \* \*

## CERTIFICATE OF SERVICE

I CERTIFY that this document has been filed via CM/ECF on January 14, 2019, for electronic distribution to counsel of record in this action.

*s/Charles Wiggins*
Charles T. Wiggins
Florida Bar No. 0048021
ctw@beggslane.com
BEGGS & LANE RLLP
501 Commendencia Street
Pensacola, Florida 32502
Telephone: (850) 432-2451
Facsimile: (850) 469-3331
Attorneys for Jerry T. Vertefeuille